BARNES, J.,
 

 for the Court:
 

 ¶ 1. John Joseph Cantin (Joseph) and Rebecca Cantin (Becky) were divorced in 2004. The Warren County Chancery Court awarded Becky primary physical custody of the couple’s daughter, who was two years old at the time, and child support. In 2009, Becky petitioned the chancery court for an increase in child support payments and requested that Joseph’s visitation be supervised. Joseph responded with a motion for contempt and request for a modification in primary physical custody. The chancery court denied Joseph’s motion and awarded Becky an increase in the child support payments. The chancellor also ordered supervision of Joseph’s visitation with his daughter for a period of six months. Joseph appeals the chancellor’s judgment, and finding no error, we affirm.
 

 SUMMARY OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Joseph and Becky were granted a divorce on the ground of irreconcilable differences on April 12, 2004.
 
 [1]
 
 The couple had one child born of the marriage, Zoie Elizabeth Cantin, who was born on November 21, 2001. In the divorce decree and custody agreement, Becky was awarded primary physical custody of Zoie; Joseph was given standard visitation rights. Also, Joseph was ordered to pay $380 per month in child support.
 

 ¶ 3. In May 2008, after Zoie had exhibited some inappropriate sexualized behavior, Joseph took her to Sharon Holmberg, a licensed social worker, for counseling. Holmberg noted that Zoie had adjustment disorder and was experiencing emotional issues due to the divorce. She also recommended that Zoie be tested for attention deficit hyperactivity disorder (ADHD). This diagnosis was later confirmed by a psychiatrist, who treated Zoie for the disorder. Becky continued to take Zoie to counseling; however, Joseph rarely participated in the sessions after the initial visit. Becky, at the advice of Holmberg, attended parenting classes.
 

 ¶ 4. On January 6, 2009, Becky petitioned the chancery court for an increase in child support and for Joseph’s visits with Zoie to be supervised. Her basis for requesting the supervised visitation was an incident of domestic violence in October 2008 between Joseph and his third wife,
 
 *946
 
 Jessica, and his alleged drinking of alcohol in Zoie’s presence. Joseph responded with a motion for contempt against Becky, claiming that she was denying Joseph his scheduled visitation with Zoie. His motion also requested a modification in custody to grant him primary physical custody.
 

 ¶ 5. Three hearings were held on the motions. The chancery court’s final judgment on December 30, 2009, found: (1) there was no material change in circumstances that adversely affected the minor child; (2) the parties should continue with family counseling; (3) Joseph’s visitation was to be supervised for a period of six month, after which a hearing would be held to determine future visitation rights; and (4) child support payments would be increased to $680 per month, based on Joseph’s increased income and Zoie’s needs. The chancery court reiterated its holding in a subsequent “Memorandum Opinion and Final Judgment” entered on March 31, 2010. Joseph filed a motion to abate his supervised visitation. He also submitted a notice of appeal of the chancellor’s decision on April 29, 2010.
 

 ¶ 6. A review hearing regarding the status of Joseph’s visitation was held on June 25, 2010. The chancellor issued a judgment on July 3, 2010, noting that Joseph’s employment as a towboat captain had prevented him from attending some counseling sessions and exercising his scheduled visitation with Zoie. His work schedule required him to be away from home .for weeks at a time. Therefore, the chancellor extended Joseph’s supervised visitation with Zoie and adjusted the visitation schedule to accommodate Joseph’s unique work schedule. After a period of six months, Joseph was to be given unsupervised visitation on certain weekends through May 2011. In June 2011, standard visitation rights would be reinstated.
 

 ¶ 7. On appeal, Joseph alleges that the chancellor erred in granting supervised visitation and in considering biased and erroneous testimony by Holmberg, Zoie’s counselor. He also claims that the chancellor’s finding, that a material change in circumstances had not occurred to warrant a change in custody, was error. Finding that Joseph’s assignments of error are without merit, we affirm the chancery court’s judgment.
 

 STANDARD OF REVIEW
 

 ¶ 8. A chancellor’s findings of fact will not be disturbed if “supported by substantial, credible evidence.”
 
 Bolton v. Bolton,
 
 63 So.3d 600, 612 (¶ 39) (Miss.Ct.App. 2011) (citing
 
 T.K. v. H.K.,
 
 24 So.3d 1055, 1062 (¶ 21) (Miss.Ct.App.2010)). However, if the chancellor’s findings are “manifestly wrong or clearly erroneous,” we will reverse the judgment.
 
 Id.
 

 I. Whether the chancery court erred in its consideration of Holmberg’s testimony and by ordering temporary supervision of Joseph’s visitation.
 

 ¶ 9. Holmberg testified at two hearings held on May 5, 2009, and October 10, 2009, and a subsequent June 25, 2010 review hearing, regarding her treatment of Zoie and her interaction with Zoie’s family. She recommended, for the immediate future, that Joseph’s visits with Zoie be supervised. Joseph contends Holmberg’s testimony was “tainted, inaccurate, and lacked integrity and credibility.” Thus, he claims the chancellor’s order of supervised visitation based on such testimony was error.
 

 ¶ 10. As Becky correctly notes in her brief, Joseph’s argument regarding whether supervised visitation was warranted is moot as he was scheduled to receive unsupervised visitation beginning on June
 
 *947
 
 1, 2011. Furthermore, we find no error in the chancellor’s consideration of Holm-berg’s testimony. “The chancery court sitting as the trier of fact has the primary authority and responsibility to assess the credibility of witnesses.”
 
 In re Estate of Taylor v. Thompson,
 
 609 So.2d 390, 393 (Miss.1992) (citing
 
 Bryan v. Holzer,
 
 589 So.2d 648, 659 (Miss.1991)). The chancery court recognized Holmberg as a “qualified licensed social worker.” At the time of the first hearing, she had counseled and interacted with Zoie and her family for approximately one year. Holmberg testified that Zoie suffered from adjustment disorder and emotional issues related to her parents’ divorce and their occasional hostility toward one another.
 

 ¶ 11. Holmberg testified: “Zoie loves her dad very much, very much, and really wants a relationship with him.” But she also noted: “Sometimes she wants to be with him and sometimes she doesn’t, because sometimes she catches him in what she calls a lie and she gets upset because she’s been lied to, and then other times, she loves him dearly and can’t wait to see him[J” Although Joseph labels this testimony as “contradictory,” we find it to be candid and reflective of Zoie’s confused feelings toward her father as a result of the divorce, his two subsequent marriages, and his work schedule, which requires him to be out of town for lengthy periods of time.
 

 ¶ 12. Joseph argues Holmberg’s testimony — that he drank alcohol around Zoie and possibly used drugs — was prejudicial and based merely on allegations made by to her by Becky. He asserted at the November 6, 2009 hearing that he does not take drugs, noting that his job requires random drug testing, and he merely has the occasional social drink when he is at home. But the record reflects Zoie told Holmberg that her father had been drinking. Holmberg stated: “[W]e have talked about drinking and driving and [Zoie] knows that that’s not safe[,] and
 
 she overtly admits that dad, does that with her
 
 and that ... even when Dad was married to [Jessica] that when she did visit and have overnight stays with him that they both drank.” (Emphasis added). Holmberg did say that Becky told her that Joseph had been using drugs. Holmberg admitted to the chancellor that this information was “hearsay,” yet she contended that Joseph had confronted her personally on one occasion, and his “whole demeanor was changed” and “his eyes were glazed over.”
 

 ¶ 13. Joseph also submits that Holm-berg’s close association with Becky tainted her testimony. We do not find it unusual that Holmberg had a better relationship with Becky, since Joseph essentially withdrew himself from the counseling process. Holmberg had very little contact with Joseph after the initial visit. Further, Holm-berg appropriately referred Becky to another counselor so that Becky’s personal issues would not interfere with Zoie’s counseling. We do not find that Holm-berg’s interaction with Becky affected the credibility of her testimony.
 

 ¶ 14. Accordingly, we find no abuse of discretion in the chancellor’s consideration of Holmberg’s testimony and in the restriction of Joseph’s visitation. This issue is without merit.
 

 II. Whether the chancery court erred in finding there was no material change in circumstances that warranted a change in custody.
 

 ¶ 15. In its December 20, 2009 judgment, the chancery court stated:
 

 After considering all of the evidence in this cause, and the applicable law, the Court finds that a material change in circumstances has not occurred which adversely affects the minor child. The
 
 *948
 
 Court finds that the best interest of the minor child does not warrant a modification of custody.
 

 For a request to modify custody to be successful, the non-custodial parent “must show: (1) a material change in circumstances has occurred since the issuance of the judgment or decree sought to be modified, (2) the change adversely affects the welfare of the child, and (3) the proposed change in custody would be in the best interest of the child.”
 
 Bolton,
 
 63 So.3d at 609 (¶ 28) (quoting
 
 Ellis v. Ellis,
 
 952 So.2d 982, 989 (¶ 17) (Miss.Ct.App.2006)). The chancellor must consider the totality of the circumstances to determine “whether there was a material change in circumstances.”
 
 Minter v. Minter,
 
 29 So.3d 840, 847 (¶ 26) (Miss.Ct.App.2009) (citing
 
 Mabus v. Mabus,
 
 847 So.2d 815, 818 (¶ 8) (Miss.2003)). “[T]he polestar consideration in any child custody matter is the best interest and welfare of the child.”
 
 Id.
 

 ¶ 16. Joseph claims that Becky “is deceitful and purposely attempts to deny [him] his rightful visitation[.]” He also alleges that Becky has subjected Zoie to “negative influences and circumstances” and that the situation in her home is “dysfunctional, stressful, unstructured, and confusing.” Joseph refers to Becky’s need for counseling, the fact that she has had two aneurysms, and that she lives with her “boyfriend without the benefit of marriage.”
 

 ¶ 17. At the November 6, 2009 hearing, when Joseph was asked why he thought it was in Zoie’s best interest to be in his custody, he stated: “Because what has changed. [Becky’s] health. Everything the counselor has told us. There’s a lot of detrimental things at that household that Zoie would be better off at my household because I don’t have all those health issues that she has and all the things the psychiatrist pointed out.” However, after reviewing the record, we cannot say the chancery court erred.
 

 ¶ 18. In regard to Becky’s mental and physical health, the testimony shows that Becky was attending parenting classes to deal appropriately with Zoie’s emotional issues and ADHD. Becky also testified that she had only one aneurysm, not two, and her physician said it was not the product of a chronic issue and “did not think it would ever happen again.” She claimed that she was “in good health.”
 

 ¶ 19. As to the chancellor’s consideration of Becky’s domestic situation, this Court has held that “a parent’s relationships or indiscretions, standing alone, are not enough to constitute a material change in circumstances.”
 
 Self v. Lewis,
 
 64 So.3d 578, 586 (¶ 38) (Miss.Ct.App.2011). Zoie resided with Becky and Becky’s fiancé, Tim Wright. At the time of the initial hearing, Becky had been in a relationship with Tim for approximately three years, and the couple had been engaged for approximately eighteen months. Becky testified that she wanted “a long engagement” since her first two marriages had ended in divorce. At the final hearing, Tim had moved from Becky’s home, but the couple was still engaged to be married. There was no testimony that Zoie had any problems related to Tim’s presence in the household. We also observe that since his divorce from Becky, Joseph had remarried twice and was in the process of divorcing his fourth wife, Chrissy. He also admitted that his last three wives had taken out temporary restraining orders against him.
 

 ¶ 20. “[0]nly parental behavior that poses a clear danger to the child’s mental or emotional health can justify a custody change.”
 
 Gainey v. Edington,
 
 24 So.3d 333, 336 (¶ 10) (Miss.Ct.App.2009) (quoting
 
 Lambert v. Lambert,
 
 872 So.2d 679, 684 (¶22) (Miss.Ct.App.2003)). We find that Joseph has presented no evidence Becky
 
 *949
 
 failed to ensure Zoie’s health and safety. Joseph claimed that there was a propane tank hooked up to Becky’s home, allegedly to her heating system. Although Becky admitted there was a single incident in November 2008 involving an electrical outlet in Becky’s home that sparked and smoked, she also noted that it was quickly contained by Tim, and no one in the home was injured. Furthermore, Becky testified that she limited Zoie’s visitation with Joseph due to a violent domestic incident involving Joseph’s third wife that occurred while Zoie was visiting him. There was also conflicting testimony that Joseph may have driven a car, with Zoie as a passenger, while he was drinking alcohol. Becky also stated that Joseph does not require Zoie to wear a seatbelt. Becky’s reason for requesting supervised visitation was to protect Zoie from potential harm.
 

 ¶ 21. “In determining whether an adverse material change has occurred, ‘the chancellor is required to consider the situation of the child in its totality and may not confine himself to consideration of isolated incidents or events.’ ”
 
 McCarty v. McCarty,
 
 52 So.3d 1221, 1227 (¶ 23) (Miss. Ct.App.2011) (citing
 
 Ferguson v. Ferguson,
 
 782 So.2d 181, 183 (¶ 5) (Miss.Ct.App. 2001)). Joseph presented no substantial evidence that Becky’s custody of Zoie had changed materially between 2004 and 2009 or that a change in custody was in Zoie’s best interest. Further, had Joseph been granted primary physical custody, his work schedule, which requires him to be away from home for weeks at a time, would have required that he routinely enlist help from other caregivers for Zoie while he was away. Joseph’s personal life appeared to be in turmoil; he admitted, at the hearing on November 6, 2009, that he had filed for divorce from his fourth wife. Becky, on the other hand, was in a relatively stable relationship, had a normal work schedule, regularly took Zoie to her counseling sessions, and encouraged Zoie to participate in extracurricular activities.
 

 ¶22. Based on the foregoing reasons, we find the chancery court’s denial of Joseph’s motion for modification of custody was not manifest error, and we affirm the judgment.
 

 ¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF WARREN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. FAIR, J„ NOT PARTICIPATING.
 

 [1]
 

 . This was the second marriage for both Becky and Joseph.